Good morning, everyone. First case for the day is In Re Avandia Marketing, Sales and Products Liability litigation. This one being 18-10. Mr. Sobel? Good morning, Your Honor. May I begin? Good morning. May it please the Court. Yes, I have reserved three minutes, Your Honor, if that's acceptable. And good morning. May it please the Court. I'm Tom Sobel for the plaintiffs. In a proposed class of United States health benefit providers who paid for Avandia during the early 2000s. The arc of this case in brief is this. From 1999 until about at least August of 2007, drug maker GlaxoSmithKline misrepresented the cardiovascular characteristics of Avandia in every way imaginable. It misrepresented the ischemic cardiac risks of the product, its potential for creating congestive heart failure. It misrepresented its limited profiles. Other than ICT-42, what studies prior to 2007 showed significant cardiac risk? There were, before the launch of the product, there were studies that GSK had regarding ischemic cardiac risk. If you look at our fact proffer at 1096-99, our summary judgment briefing at 1039, and Dr. Abramson's second report at 1199 and 1203-5, what is indicated there is that even before the launch of the product, GSK had studies which showed that there was a statistically significantly increased 73% risk of Avandia overpooled characteristics that it had internally. Then shortly after that, GSK also had information about the ischemic risks that it reported to the Canadian officials, but did not report here. Did the Canadian officials have the same information the FDA had? They had more. At this point, with respect to this particular risk, they had more. The Canadian officials, unlike United States physicians, were given as early as 1999 compelling data regarding the ischemic cardiac risks of Avandia. By GSK? By GSK. So they gave the Canadian folks different information they gave the FDA? Correct, Your Honor. Sorry? Why is that? Did the Canadian authorities ask for it and the FDA didn't, or did they make a choice? The Canadian officials asked for it, demanded that the study be conducted because they were concerned about fluid being retained in patients, and GSK conducted the tests and gave it to the Canadian officials, did not give it here in the United States. What did the label in 2001 say with regard to any kind of risk? The U.S. label? Yeah. So with respect to ischemic cardiac risks, it was silent. With respect to congestive heart failure, there was what we say was a wholly inadequate disclosure that congestive heart failure, excuse me, that Avandia may increase liquid retention, and that can cause congestive heart failure. It was not until 2006 or 2005, excuse me, that that label was strengthened to be able to show that, in fact, it does cause congestive heart failure. How different was the Canadian label initially than the American label? In this respect, I don't know, Your Honor. I do know the information regarding the ischemic heart risk, but not regarding congestive heart failure. Also, continuing with your question about ischemic heart, excuse me, ischemic cardiac events, not only was there before 1999 the information that GSK had and the information about the Canadian officials, but GSK did an internal study, ICT37, a meta-analysis that it had the results of in 2004 that also showed an increased ischemic, a risk of ischemic cardiac events. That was not disclosed until by GSK and only inadequately until the fall of 2006 when it filed a PAS. What is it that the plans want or what is it that you contend should have been done? Do I correctly understand your position to be that you really only wanted GSK to include the warnings that are currently on Avandia's label? Generally speaking, that's right. But at an earlier point in time. That's generally correct in the vernacular, Your Honor. Of course, you can't have a 42 study if only 37 studies have existed at a certain point in time. What we wanted GSK to do with respect to the label, I'll talk about in a minute something more broadly. But with respect to the label, at the outset, at Jump Street in 1999, that label should have had disclosures regarding what GSK had internally regarding ischemic cardiac events, number one. And number two, certainly quite early on, certainly by 2001, there should have been far more grave warnings regarding congestive heart failure as well. GSK also should have warned regarding study after study after study that it had regarding the propensity of Avandia to increase fluids in people and therefore create the potential for congestive heart failure. All of that should have been warned quite early on. And if it had been, then GSK's message, the other thing we want, is that GSK should not have gone out into the public and said, this product, because it reduces insulin resistance, can actually help diabetic patients with their heart conditions. In other words, it can reduce that. So what we say that GSK should have done is disclose the truth earlier on, which, of course, the FDA never in any way prevented it from doing, number one. And number two, it shouldn't have marketed this product as reducing insulin resistance, which will, therefore, give you better heart results. If any of that had happened, there would have been no sales at all. So I understand correctly. You claim you wanted GSK to warn of congestive heart failure earlier than it did, right? And in a more compelling way than the way that it did, yes. Didn't the February 2001 label include a warning that Avandia could cause heart failure? Yes. There is a warning. So how much earlier could GSK have warned of this risk? At the launch, GSK could have and should have warned regarding the propensity of the product to create increased fluids in people. Based on the results of the studies prelaunch? Yes, yes. And so in our brief, Your Honor, you'll note that there's a section that goes on at some length that identifies each of the studies that existed that GSK had prelaunch on this issue. What evidence is there that GSK knew of the risk of heart failure prior to 2001 but failed to warn of that risk? Sure. So that evidence is? Would it include study 1193, 79, and 20? Yes. There's a litany of the tests that are identified in our brief. Here we are. And 96? Yeah. So the 096 study, the 079 study, the 020 study, the 093 study, the 080 study, the 011 study, all of those studies existed before 2011, most of them even before the launch of the product, all of which showed, according to our detailed fact proffer, that this product was causing increase in cholesterol levels, increase in fluid, going to therefore cause a propensity of congestive heart failure. And when the warning came out in 2011, that warning was inadequate because it only had a general discussion regarding fluid retention and did not say unequivocally, as the later did, that this product does cause CHF. What about this e-mail of May 1999? It appears in the supplemental appendix 87. To say Evandia's lipid effects were beneficial could be construed as misleading as we are worse than almost every comparator in this regard. By GSK's chief biostatistician. So that's not some low-level person saying, you know, say one thing or another as a sort of a rogue employee. That was GSK's chief biostatistician making that admission. Of course, that's in our sealed appendix, not in our open public, that the doctors could have known at the time the product was launched. And as you can indicate from the- Your position is GSK obviously knew this. Well, of course. The chief biostatistician said it. I mean, that's the kind of sort of just absolutely fundamental nondisclosure of what occurred here. And again, going back to Chief Judge Smith's question about what it is that the third-party payers want here, those kind of disclosures have been made from the very beginning. This product wouldn't have become state-of-the-art. It was standard of care. It was treated by endocrinologists and primary care physicians as the drug that they are supposed to use in the first instance in order to control blood sugar levels. But when people found out about what just happened, it dropped from standard of care to not to be used, and fairly over a short period of time ended up being the drug that was absolutely not to be used. At its height, how much more was it prescribed than metformin? It was prescribed in conjunction with metformin quite often, right? But also sometimes in lieu thereof, right? But it was the standard of care, what needed to be treated. So doctors were treating people for their blood condition with this product, not knowing that it had a propensity to actually give them serious ischemic events and CHF. Talk to us a little bit about the RICO claims. So the point I want to make beyond the briefs is this. Information takes on a completely different color depending upon whether or not you're able to mask who it is that's delivering the message. So one thing that has become clear with marketing cases like this regarding the pharmaceutical industry is that if a drug maker can have somebody else make its pitch for some ostensible neutral party who is making the communication, that communication is going to get accepted far more than if it was just the drug rep itself who was trying to make the pitch. So what we allege here is that the only way to make sure that your false marketing is to be approved is that you work with others, so you work through. All right. So explain the distinctiveness aspect of the RICO enterprise. Sure. The way that I summarize it is this. What RICO tells us is that if you're accomplishing something through a group of separate people that you couldn't accomplish as well or the same way on your own. And those separate people here are alleged to be who? Are BMS. A competitor. Dr. Hafler. The big drug company is a separate company. BMS is a separate company than GSK. GSK is trying to treat BMS like at times a competitor and therefore seemingly an honest broker for this product when it goes into the marketplace. But it wasn't because it was peddling something that was false. The same thing with the Dr. Hafler who we identify and then there are also consultants and PR firms that we identify, all of whom, much like in the First Circuit's Narantan case, right, and in other cases like it, the distinctiveness requirement is being accomplished. In other words, you're accomplishing your objectives of marketing the product and selling it through third parties in a way that you could not accomplish if you were doing it on your own. Thank you. We'll have you back on rebuttal. Thank you. Thank you and good morning, Your Honors. May it please the Court. I want to address both this off-label or benefits claim and the preemption. I want to start with the preemption, if I may, and I want to get to the ischemic risk warning and the congestive heart warning because Mr. Sobel was very clear at summary judgment. They want what's on the current label. But I want to first just correct something. He repeated that here. Correct. I want to correct, though, what he said about these pre-approval, pre-2000 issues because if you look at the JA at 873, at 875, and at 901 of the Joint Appendix, you will see that in the medical review at the time of the approval, GSK had produced studies 11, 20, 24, 93, 94, 80, and 90, and in the supplemental new drug application had produced 079 and 096. Every single one of these studies that they suggest was not provided to the FDA before the approval had been, but equally important, as Judge Roof recognized, if there had been some fraud on the FDA prior to the approval, that doesn't speak to the question of whether GSK could have modified a label. That would simply be a question of fraud on the FDA, and that would be preempted under Buckman and Section 337A of the FDCA. How do you reconcile that with what appears at the supplemental or sealed appendix at 171? These studies put Avandia in quite a negative light. When folks look at the response of the Avandia monotherapy arm, it is a difficult story to tell, and we would hope these studies do not see the light of day. There is no question, Your Honor, that there were discussions within GSK about the potential risks prior to the approval. All of that was presented to the FDA. Obviously, the FDA is going to... That's a little more than a discussion of risk. Your Honor, there's no question. All of this, and the FDA could have decided not to approve the drug or could have put a different warning on it, but once the FDA puts a warning on the drug, federal law mandates that if we don't market a drug with that warning, the drug is misbranded. The only exception is if we could change the warning after the approval based on new information. So it was this information, this conversation about these studies not seeing the light of day, that was shared with the FDA? Absolutely, and you can look at those sites I gave you in the joint appendix. All of these studies were, in fact, provided to the FDA. Not the studies. I'm asking you about the e-mail and the conversation. I would have to check. I believe all of this information was presented to the FDA, but if it was not, if it's preapproval, then the remedy is not a question of preemption. The remedy is fraud on the FDA, and that's preempted. The question... What about your client's efforts to bring this to the public's attention independent of the FDA, knowing all this information? Your Honor, we brought to the FDA's attention all of the studies that we provided. We brought to the attention in October of 2005, ICT37. A year later, when we had ICT40... Including the studies that you hoped would never see the light of day? Not you, but your client? Your Honor, we brought every... There is no study relevant to cardiovascular risk that was not provided to the FDA. Even if you look at the warning letters, all of the studies relevant to the ultimate warnings in 2007, 2011, 2014, every one of those studies is either not even referenced as missing or is referenced as having provided to the FDA even if it was omitted in one of the annual reports. And the key question for preemption, your Honor, is could GSK have modified the label for ischemic risk or for congestive heart failure earlier than when the FDA did? And here I want to make clear... How can we be sure the FDA would have rejected any CVE warning prior to 2007? Well, we know that in a few respects. First of all, we provided the FDA with an actual prior approval supplement request to the FDA in 2006. We updated it and modified it in 2007, and we got a rejection letter. The rejection letter was absolutely clear, and unlike in the FOSMAX... I'm talking about a CVE, not a PAS. Well, we actually communicated with the FDA, and they told us not to use a CVE. They said the CVE would pull the rug out from under their own internal analysis, and so we filed a PAS. That was the advice of Dr. Park. Is that correct? That wasn't necessarily a command. It was a, you can do what you want, but my strong advice is you should wait and let the dust settle and let's figure this out. Correct, Your Honor. But what happened when we provided the PAS a year later, and we gave them all of that data from ICT42, the FDA's response was very unlike the response in the FOSMAX case where, as you'll recall, there was a question about whether the science supported a stronger warning and whether the warning that the company that Merck had asked for was given with the right language, stress fractures versus atypical femoral. Here, what the FDA said was we're concerned that the overall science doesn't support a stronger warning. We want more information, including we want record, the study, the record study, which was the gold standard. It was the only cardiovascular study at issue. All of the RCTs, the ICT42, were short-term efficacy studies. GSK unblinded. They stopped in the middle of a long-term study, gave the FDA the information from record, and then what the FDA did was it said we can only give a warning for ischemic risk, which they did in 2007, if we also note on that label that the data from the long-term trial is inconclusive. And so we know that the FDA would not have permitted a stronger warning. Can you respond to the 2008 FDA warning letter that was critiquing GSK for not disclosing studies between 01 and 07? That was a warning letter, Your Honor, which is the same issue with respect to what GSK, as we understand, pled to. It's a records violation, and we did not provide on our annual reports in some of the years updates on studies. But the FDA says in that letter, in that warning letter, if you look, and this is JA2451, it says although adopt and record and approach and these other studies were not included in the mandatory NDA annual reports, we acknowledge that they were disclosed in other reports and notifications to the FDA. And again, this was produced, all of this was then produced to the FDA before they issued their ultimate warning in 2007. Yeah, what happened in 2012 is you pleaded to a criminal information for failing to disclose risk to the FDA, right? No, Your Honor. I beg to differ. We did not plead to failing to disclose risk at all. What was the one kind of thing you pleaded to? We pled to not having disclosed, as they said, on our annual reports. On our annual reports, we didn't, we were supposed to provide information about every one of our studies, and some of the studies were omitted from our annual reports, even though they had been disclosed elsewhere. Which studies were omitted? There were, there were, it says here, and I'm reading from the warning letter, although adopt and record and approach and 193 and 468 were not included in the mandatory annual reports, we acknowledge that they were disclosed in other reports and or notifications to the FDA. So all of the cardiovascular risk studies were reported to the FDA. We asked for a stronger label, and the label was unambiguously rejected, because the science was something the FDA wasn't comfortable with. Were the Canadian authorities provided with the same information that the FDA was in early 2000? They were, and there is absolutely nothing in the record to support Mr. Sobel's suggestion to the contrary. Now, the Canadians have different standards, and obviously we have our own standards that we Was the Canadian label different initially than the label that you had on your product in 01? I don't know whether there were differences. It's not in the record, Your Honor. We obviously are obligated to follow what the FDA requires in the United States, and we used the label that the FDA required when it was approved. The FDA added on congestive heart failure a special warning in 2001, and the update in 2007 was an update to a black box, but obviously the plaintiffs understand and conceded that we don't have the authority to make something a black box. There was a European label, too, wasn't there? I'm sure there was. The product was sold there. Again, that's not something that's in the record with respect to the question of preemption. The issue of preemption before this court, Your Honor. But it would seem, I'm just thinking from out in left field, if the Canadian label and or the European label had more warning on it than did the U.S. label, it might indicate that there was something known, and you disclose it elsewhere but not in the U.S. But, Your Honor, we have disclosed all of the studies that are relevant to cardiovascular risk to the FDA. We disclosed them all, as I gave you the record sites, before the approval of the drug. We disclosed ICT 37 in October of 2005 when we had ICT 42, which we saw as being indicative of a stronger risk of ischemic risk. We asked the FDA to strengthen the label. They said, no, we can't strengthen it, but we want to do more analysis. Then when we gave them the unblinded long-term study of actual cardiovascular risk, we gave them the data. They came back in November of 2007, and they said, now we are approving a stronger ischemic risk label with a statement that the long-term studies are inconclusive. So with respect to the preemption, I think this is actually as clear evidence as you can find, because we asked for the very label that they say we should have had today. They said at summary judgment and today, we want the label that's on today. Now, they don't I still can't figure out how you can say that you have clear evidence that the FDA would have rejected any CBE warning prior to 07. Well, Your Honor, the question is whether they would have rejected a stronger label, not a particular vehicle for getting a stronger label. There's a CBE option, which you can do, and we told the FDA we wanted to do an FDA CBE. They said, we strongly warn you against doing it. It will pull the rug out from under what we're doing with our analysis. So then we went and we filed a PAS, and in fact, there is a regulation, an FDA regulation, it's 21 CFR 31470C5I, that says when a warning may be changed by a CBE, it's appropriate to be changed by a CBE, but the FDA tells you a CBE is not appropriate, then you have to file a PAS, and that's what we did. We asked the FDA, and of course, we know given how the FDA reacted to the PAS, how they would have reacted had we gone ahead and filed the CBE. I'd like my colleagues to have other questions. I'd like to switch to the benefits theory and ask some questions on that. Sure. Thank you, Your Honor. We've already reviewed the RICO pleadings in an interlocutory appeal. Why didn't GSK raise the failure to plead in Enterprise then? The Enterprise or the benefits question? The Enterprise. Oh, the Enterprise. Your Honor, I think we filed our initial motion to dismiss. We raised the Enterprise issue, obviously, in a sense as a 12C motion, which we're entitled to do. I can't tell you what the thinking was behind why we didn't move on the Enterprise issue at the time. The Enterprise issue, I think, is clear because at JA 1537, the plaintiff's allegation is that GSK had control over the entire Enterprise and the other members of the Enterprise simply, and this is at paragraph 246 of the complaint, worked to enable GSK to sell. So what GSK was doing, for example, even though Bristol-Myers is named as part of the Enterprise, Bristol-Myers wasn't out there like in a bid-rigging conspiracy trying to promote its own advantage. GSK was... Well, this Court has made clear, and that's... But, I mean, the answer is no, right? The answer is you don't have to if you're looking at it on a 12C basis. That's what Rosenau versus Unifund 539F3218 stands for, that a court can, as long as it confines itself just to the pleadings, make a Rule 12C determination even after discovery is commenced. If I may turn to the benefits... Turn specifically to the benefits. Yes. Senator, Your Honor. Was the benefits theory belated? Was it belated? Why is it what you claimed it was belated? Because, Your Honor, the plaintiffs never said in the Court below, the one thing that they have said in their appellate brief at pages 49 to 52, that all we should have done was not promoted the benefits. At every stage in the case below, at the motion to dismiss, when they pointed out the misrepresentation was about risk in their complaint, at summary judgment, it was always, you should have disclosed the risk. Mr. Sobo was pretty candid when he said... But the second sentence of their opposition to the summary judgment discusses the benefits theory. It's on JA 1035. Your Honor. The second sentence says, GSK falsely promised better cardiovascular outcomes compared with our diabetes drugs and built a vani into a blockbuster success. Correct, Your Honor. Their theory of benefits, when they mentioned benefits three times in 288 paragraphs in a complaint, it is the way in which we overpromoted... You mentioned it from the complaint through the briefing on the motion to dismiss. Yes, I may. Through the briefing and the summary judgment. It was consistently raised. Your Honor, it was not a theory of benefits. It was a theory that the way in which we misrepresented a vani we overpromised, in part, some benefits. The key thing is, a benefits claim would have said to the court below, all GSK should have done was spoken less, not talked about the benefits. Instead, their claim throughout was, we should have spoken more. We should have disclosed the risk. They said in their summary judgment, the essence of this case, the essence of this case is, look what happened in 2007. That's the chart. And he even said it this morning. As soon as the risks were disclosed, the bottom fell out of this market. They didn't bring a pure benefits claim. Their references, there were three references in the complaint to benefits, were simply to show how we were hiding the risks. And, in fact, when we challenged them at the motion to dismiss and they said, you don't have a misrepresentation here, what did they come back with? They came back in their motion to dismiss briefing and they said, of course we have a misrepresentation. The misrepresentation is you didn't disclose the risks. The district court discussed the benefits theory at the motion to dismiss and our court referenced it when we last heard this appeal and that's at JA 13. Again, Your Honor, the issue is not whether they have some references to benefits. The issue is whether or not the benefits were referenced by them as a way to conceal the risks, not whether there was a question of benefits. Their theory all along was we didn't disclose the truths about the product. And if we can't disclose the risks earlier because that's preempted, then they don't have an independent benefits claim. Judge Ruth for five years managed this case. She engaged with the discovery. She engaged with all aspects of this and she said this is not a fully formed theory. She didn't say they never mentioned the word benefits. She said this was not an independent theory because they never said to her all we're asking, Your Honor, for is to find that they should have ceased from making that representation. Well, do they have to ask the district court judge that or can they plead it? Well, if they had. Didn't they plead it? Well, what courts do at summary judgment, and I'll give you one precedent for this, it's Bear Stearns 969F second 339, it's a 2013 case, but there are other cases throughout that address this. At summary judgment, when courts are faced with a late-breaking claim of fraud, and the question is is that really in the case, what the courts do, the trial courts in their discretion do is they review the complaint and they look and see if it meets the 9B standard. And Judge Ruth, in her opinion, said they didn't plead this benefits with particularity. They didn't say who made a specific benefit, who relied on it, what the actual statement was, how that person's buying conduct would have changed. She found, doing the proper analysis at summary judgment, that this was not properly in the case. Had they moved for Rule 15, it would have been clear. She would have denied it and it would not have been an abuse of discretion. We didn't address the benefits theory early because we didn't know that this was even part of the case. Doesn't the complaint reimport GSK promises of superior treatment and better cardiovascular outcomes compared with other diabetes drugs? Your Honor, that is one of three references to benefits. The superior treatment, but Your Honor, they don't. Excuse me. Yes. Thank you. Sorry, Your Honor. What does the numerosity of references have to do with whether or not the issue is out there? The question, Your Honor, is if they had one reference, but it was a clearly articulated theory of benefits that said, Your Honor, that said in the complaint, we allege that you promised that this has cardiovascular benefits. And here's how, here's what you said, and here's who relied on it, and here's how that representation affected our purchasing decisions. That would be a non-preemptive claim and it would be a clear benefits claim. When we moved to dismiss the case, their response was, what is our causation? GSK thinks we don't have causation. Our causation is when you disclose the risks, we stop buying. We said, what was the misrepresentation? They said the misrepresentation was not disclosing the risks. What Judge Roof understood after monitoring and watching this case for five years was, yes, they had referenced the word benefits. They had even a few sentences about benefits. But when they were talking about benefits, it wasn't as an independent theory. It was part of their theory that we should have disclosed the risks earlier. Thank you very much, Mr. Levine. Thank you. Mr. Silver, you have rebuttal. Could you start with the benefits piece? We didn't hear from you earlier on that. So I was brought in to be co-lead counsel after the appeal from this court. That's always a rather inadequate way to begin an answer. The record shows what the record shows. Sure, absolutely. But that's my point. Because then at that point, I read the record and I read the complaint, right? And we tried to pick up and move from there, right? And it's obvious that this is an issue. As I indicated to the court, I don't think this is a concession. I think this is a practical way to look at it. It's two sides of the same coin. If you talk about cardiovascular risks and you don't talk about the fact that they're therefore in the absence of benefits, it is the same thing. This complaint goes on and on about how it is that the product was falsely marketed as insulin. It slows insulin resistance and therefore creates cardioprotective benefits. How was the benefits claim developed from the complaint forward? Well, so if Your Honor goes through the detailed 30-page fact proffer that we have, we also had a response to each of the facts that have proposed by GSK. And there are two extensive declarations with enormous amount of exhibits by Dr. Abramson that goes on and on. He goes through in detail how it is that the product was marketed. And that was all before the district court judge. I mean, you can't tell from the opinion because there's not really much mention made of the materials that we had submitted. But going through each of the declarations of Dr. Abramson, you can see what it is that was being marketed here were ostensible cardioprotective benefits of something that actually had enormous, significant, serious cardiovascular risks. So I think that that's how it was developed, obviously through experts, through us filing a detailed fact proffer and all the rest of that. I'll also just say as an example, speaking again a little bit too colloquially, I spoke to my son about this who was in nursing school and I tried to have one of my long-winded lawyer answers about what the case was about and he interrupted me and said, Dad, is this the drug that was marketed as cardioprotective and it turns out that it wasn't? I was like, yeah, Joe, that's what the case is about. So it's been throughout this case that this issue has been there. I just want in the few minutes I have left just to point out a couple of the facts regarding the CDE actual process. I think there's a sub silentio hearsay objection from over on that side of the podium. Fair enough. But we'll take that. Mr. Lefkowitz usually has a standing objection to most of what comes out of my mouth. Perfectly fine. Just to put in context, the FDA's, the cell phone call with the woman who's driving from one meeting to another that GSKU now wants to say preempts all state law claims, which is what it is, that memo, that internal memo reflecting that is. Just so you understand, on April 20th, the FDA indicated that it had significant concern about the non-CHF risks. It was very concerned about that. That's sealed appendix 608. Then three weeks later, there was a meeting at the FDA. The FDA said at that meeting, we're really concerned about this risk as well. What are you going to do about it, GSK? And when the FDA on June 4th rejected the PAS, the FDA said, well, wait a second. We are very concerned. We are concerned about the potential risk of increased cardiac ischemia to be a significant finding that may impact a large population. That's what the FDA said at that time. They weren't concerned about a GSK over warning. They were concerned about GSK not having a warning. And as I think you've indicated, the record here shows that GSK had that information for three years before it was embroiled in that storm that it had created in the middle of 2007. Thank you very much, Mr. Sybil. Thank you, Mr. Lefkowitz. Thank you for a well-briefed case, a well-argued case. I think this is a Vandia day here, so we'll conclude this argument and move to the next. Thank you.